J-A15033-24

2024 PA Super 217

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| GERALD A. SANDUSKY | : | |
| Appellant | : | No. 1059 MDA 2023 |

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0002421-2011

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| GERALD A. SANDUSKY | : | |
| Appellant | : | No. 1060 MDA 2023 |

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0002422-2011

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:               **FILED: SEPTEMBER 19, 2024**

Appellant Gerald A. Sandusky ("Sandusky") appeals from the order entered in the Court of Common Pleas of Centre County denying his motion for a new trial based on after-discovered evidence. After careful consideration, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

In **Commonwealth v. Sandusky**, 256 A.3d 27 (Pa. Super. 2021) (non-precedential decision) ("**Sandusky III**"), a panel of this Court authored an apt summary of pertinent facts and procedural history of this case, as follows:

> On November 4, 2011, after the Thirty-Third Statewide Investigating Grand Jury issued a recommendation and presentment, the Commonwealth charged Appellant with committing numerous sexual offenses against eight young males referred to as Victims 1 through 8 in case number 2422-2011....
>
> On December 7, 2011, after the Thirty-Third Statewide Investigating Grand Jury issued another presentment, the Commonwealth charged Appellant with crimes committed against two additional victims, referred to as Victims 9 and 10 in case number 2421-2011.... The matter was held over to the Centre County Court of Common Pleas, and the Honorable John M. Cleland was specially appointed to preside.
>
> [Thereafter,] Appellant proceeded to a jury trial. On June 22, 2012, the jury found Appellant guilty of forty-five counts relating to the ten victims between 1995 and 2008.[fn 1]
>
> ---
>
> > fn 1   At case number 2421-2011, Appellant was found guilty of four counts of involuntary deviate sexual intercourse ("IDSI"), two counts of indecent assault, two counts of unlawful contact with a minor, two counts of corruption of minors, and two counts of endangering the welfare of children. At case number 2422-2011, Appellant was found guilty of four counts of IDSI, five counts of indecent assault, seven counts of unlawful contact with minors, eight counts of corruption of minors, eight counts of endangering the welfare of children, and one count of

criminal attempt to commit indecent assault. Appellant's crimes "spanned a thirteen-year period." ***Commonwealth v. Sandusky***, 77 A.3d 663, 665 (Pa. Super. 2013) ("***Sandusky I***").

---

[***Commonwealth v. Sandusky***, 203 A.3d 1033,] 1041-42 [(Pa. Super. 2019) ("***Sandusky II***")]. Appellant was sentenced to an aggregate term of thirty to sixty years of imprisonment, which included the imposition of several mandatory minimum terms pursuant to 42 Pa.C.S. § 9718(a). He filed a direct appeal to this Court, which affirmed his judgment of sentence. [***Sandusky I***, 77 A.3d] at 674. Appellant did not seek allowance of appeal in the Pennsylvania Supreme Court.

Thereafter, Appellant filed a timely petition for relief pursuant to the Post-Conviction Relief Act ("PCRA"), which asserted a panoply of grounds for relief. Following six separate evidentiary hearings, the PCRA court denied Appellant's petition. On appeal, this Court affirmed that portion of the PCRA court's holding that denied Appellant's numerous requests for a new trial,[1] but vacated his

---

[1] In the PCRA petition reviewed in ***Sandusky II***, Sandusky alleged that the victims were untruthful and that trial counsel was ineffective for failing to present expert testimony challenging repressed memory therapy. Sandusky also claimed ineffectiveness on the part of counsel, asserting Attorney Shubin obtained information with suggestive interviewing techniques that allegedly resulted in taint and interference with the victims.

In this regard, the PCRA court notes,

In past proceedings from May 6, 2015, through October 18, 2017, six evidentiary hearings were held on the PCRA petition challenging the witnesses' credibility. Specifically, Dr. Loftus presented expert testimony on repressed memory. Additional testimony was presented by an individual who had treated multiple victims. Both attorneys Amendola and civil counsel Shubin were also presented as witnesses and thoroughly examined in testimony during the PCRA proceedings. Mr. Sandusky also testified. Ultimately, the PCRA petition was denied by Judge Foradora. On review, the Pennsylvania Superior Court

*(Footnote Continued Next Page)*

judgment of sentence as illegal pursuant to ***Alleyne v. United States***, 570 U.S. 99 (2013) and ***Commonwealth v. Wolfe***, 140 A.3d 651 (Pa. 2016).[] ***See*** [***Sandusky II***, 203 A.3d at 1103-04]. Specifically, this Court found that the imposition of mandatory minimums in Appellant's case pursuant to § 9718 was unconstitutional and, therefore, must be vacated. ***Id***.

Appellant filed for allowance of appeal with our Supreme Court, which denied it. ***See Commonwealth v. Sandusky***, 216 A.3d 1029 (Pa. 2019) (*per curiam* order). Thereafter, Appellant did not petition for a writ of *certiorari* in the U.S. Supreme Court.

On November 22, 2019, Appellant was resentenced to an aggregate term of thirty to sixty years of incarceration at both above-captioned cases. ***See*** N.T. Sentencing, 11/22/19, at 38-39. With respect to financial penalties, the sentencing court's order directed that Appellant pay restitution to the Victim's Compensation Assistance Program ("VCAP") in the amount of $1,706.81. ***Id***. at 46. The sentencing court made no reference to any other restitution sums owed by Appellant. ***See also*** Sentencing Order, 12/19/19, at 4. This restitution was specifically imposed with respect to Appellant's conviction at docket number 2422-2011. In addition to the sum referenced above, Appellant's docket also reflects the imposition of additional restitution in the amount of $95,047.88. There is no mention of this amount in the transcripts of the sentencing hearing or the sentencing order.

On December 2, 2019, Appellant filed a timely post-sentence motion requesting reconsideration of the sentence imposed upon various grounds. ***See*** Post-Sentence Motion, 12/2/19, at ¶ 7(i)-(vi). However, Appellant did not therein raise any challenge to the financial conditions of his sentence. On January 28, 2020, the sentencing court held a hearing at which Appellant argued that the sentence imposed was unduly harsh in terms of his overall rehabilitative needs. At the conclusion of the hearing, the sentencing court denied Appellant's motion. ***See*** N.T. Post-Sentence Motion Hearing, 1/28/20, at 24; ***see also*** Order,

---

held that the PCRA court's findings were supported by the record and that Sandusky could not establish that the proffered evidence would have compelled a different verdict. ***Sandusky II***, [***supra***].

PCRA Court Opinion, 9/20/23, at 2.

1/31/20, at 1. Appellant filed timely notices of appeal at the above-captioned cases in February 2020.[]

On May 9, 2020, Appellant filed in this Court a motion seeking a new trial upon the basis of after-discovered evidence pursuant to Pa.R.Crim.P. 720(C). *See* Motion for New Trial on the Ground of After-Discovered Evidence, 5/9/20, at ¶¶ 1-68. Alternatively, he requested remand for further evidentiary hearings. *Id*. at ¶¶ 69-70. Two days later, Appellant filed a timely Pa.R.A.P. 1925(b) concise statements at both cases. In this filing, he asserted for the first time that the restitution provisions of his criminal sentence should be vacated. *See* Rule 1925(b) Concise Statement, 5/11/19, at ¶ 1. Appellant also noted the Rule 720(C) motion he had filed in this Court and incorporated those issues in his concise statement by reference. *Id*. at ¶ 2(A)-(E).

On June 1, 2020, the sentencing court filed a Rule 1925(a) opinion asserting that Appellant's claim concerning restitution implicated the discretionary aspects of his sentence and, ultimately, found waiver for failure to raise the claim prior to appeal. *See* Rule 1925(a) Opinion, 6/1/20, at 4. The sentencing court did not engage with the substance of Appellant's Rule 720(C) arguments, but "respectfully" raised the issue of whether Appellant had acted promptly in filing the motion. *Id*. at 5.

*Sandusky III*, 256 A.3d 27 at **1-2.

In *Sandusky III*, this Court affirmed judgment of sentence in part but vacated his restitution sentence requiring his payment of $95,047.88, explaining, ""limited remand is appropriate due to conflicting representations in the record as to the origins of the $95,047.88 in restitution." *Id.* at *6. Though we acknowledged the sentencing court's position that the figure reflected the costs of prosecution, we were constrained to conclude the record did not reveal the same. With that, we directed that, "[u]pon remand, the sentencing court shall address any outstanding issues related to the $95,047.88 in restitution discussed above. . . ." *Id*. at *6.

- 5 -

On remand, the trial court set the matter for evidentiary hearing on May 17, 2022. On that date, after most of the testimony was taken, the hearing was continued because a necessary cost witness was unavailable to testify. The PCRA court continues,

> In the interim, Sandusky's counsel filed a Motion to Unseal a Transcript and a Motion for a New Trial on the basis of after discovered evidence. Given Sandusky's request and the Commonwealth's acquiescence to permit Sandusky's counsel time to develop an expert report regarding the Motion for a New Trial and in the interest of judicial economy, [the PCRA court addressed all matters in one opinion], permitting one appeal to address all issues. [Therefore, the testimony regarding the issue of restitution and costs] concluded on May 25, 2023. After testimony was taken on the issue of costs, the [PCRA court] heard argument on the Motion for a New Trial and argument on the Motion to Unseal a Transcript.

PCRA Court Pa.R.A.P. 1925(b) Opinion, 6/27/23, at 1-3.

By the PCRA court's order and opinion of June 27, 2023, it denied Sandusky relief on all issues. First, pursuant to this Court's direction on remand, the PCRA court vacated the judgment of sentence for restitution to the extent it comprised court costs associated with the trial. Upon consideration of testimony at the May 25, 2023, hearing on costs, however, the PCRA court determined the Commonwealth met its burden of proof in demonstrating reasonable total costs of $44,688.58, of which $22,766.96 consisted of necessary costs associated with a coalition of local municipal police departments undertaking additional and special assignments and working many hours of overtime in the aggregate to meet the heightened demands of the high-profile, emotionally-charged criminal trial.

On the issue of Sandusky's Amended Motion for a New Trial based on after-discovered evidence, the PCRA court concluded that Sandusky had not satisfied the four-prong test of Pa.R.Crim.P. 720(c), which requires the movant to prove that the evidence: (1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict. ***Commonwealth v. Castro***, 93 A.3d 818, 821 n.7 (Pa. 2014).

Specifically, Sandusky presented new evidence consisting of civil Attorney Andrew Shubin's January 15, 2018, interview of victim S.S., who did not testify at trial, and an April 10, 2021, podcast featuring a known Sandusky supporter named A.J. Dillen, a young man who broadcasted his experiences and the content of three-years' worth of surreptitious recordings of his meetings with Attorney Shubin and Shubin's colleague psychologist Cynthia MacNab. To gain an audience with Shubin and MacNab, Dillen falsely posed as a former Sandusky child victim with the hope of establishing that Shubin and MacNab used unduly suggestive interviewing techniques and, in the case of MacNab, a discredited form of therapy known as repressed memory therapy, all to cast doubt on the recollections of child victims who testified against Sandusky in his criminal trial.[2]

---

[2] As discussed more thoroughly, *infra*, this Court, in ***Sandusky II***, previously rejected a similar after-discovered evidence claim aimed at discrediting victim witness testimony by alleging the use of repressed memory therapy.

- 7 -

In its order and opinion of June 27, 2023, the PCRA court applied the Rule 720(c) factors to Sandusky's after-discovered evidence and found both the third-prong and fourth-prong requirements unmet. Regarding the fourth-prong review, the court found that given the integrity and overall strength of the evidence supporting Sandusky's conviction coupled with the lack of evidence to support the use of either unduly suggestive interview techniques or repressed memory therapy, Sandusky failed to show the new evidence would likely result in a different verdict. **See also**, PCRA Court Pa.R.A.P. 1925(a) opinion, 9/20/23, at 6. Moreover, having rejected the claim that Shubin and MacNab engaged in repressed memory therapy, the trial court concluded that Sandusky's proposed expert report by Dr. Christopher Barden on the potential effects of repressed memory therapy was rendered moot. This timely appeal followed.

Sandusky raises the following issues for this Court's consideration:

1. Whether the trial court erred and denied Sandusky due process of law in denying Sandusky an evidentiary hearing on his after-discovered evidence claims where genuine issues of material fact were presented by the information related to S.S., Attorney Andrew Shubin, Cynthia MacNab, and A.J. Dillen and the expert report of Dr. Christopher Barden which called into question prior factual findings that therapy played no role in altering and enhancing purported memories and allegations of abuse and also called into question statements made by the prosecution that recovered memory/repressed memory therapy was not at issue?

2. Whether the trial court erred and denied Sandusky due process of law in denying an evidentiary hearing by finding that the expert report of Dr. Barden was markedly similar to trial testimony and PCRA testimony and did not advance any

argument not explored during the PCRA proceedings where the S.S. and A.J. Dillen information was unknown and not presented during those proceedings?

3. Whether the trial court erred and denied Sandusky due process of law in concluding that the after-discovered evidence pertaining to S.S., A.J. Dillen, and Attorney Andrew Shubin and Cynthia MacNab was merely corroborative and cumulative of evidence introduced at trial, would be used solely for impeachment purposes, and would not have likely led to a different outcome?

4. Whether the trial court erred and exceeded its authority in imposing costs of prosecution of $44,688.58 where the Superior Court remanded to address restitution under 18 Pa.C.S. § 1106, and not costs, and the bill of costs at issue was untimely submitted?

5. Whether the trial court erred when it imposed costs in the amount of $44,688.58, where $22,766.96 of those costs was not supported by any testimony or verified statements and the testimony introduced to support imposition of costs was from individuals who did not create or generate the records utilized?

Brief for Appellant, at 7-8.

Sandusky's first issue involves a new "after-discovered evidence" claim centered on the alleged use of repressed memory therapy that he maintains satisfies the requirements of Pa.R.Crim.P. 720(c) and warrants, at the very least, an evidentiary hearing, if not an immediate grant of a new trial. As discussed, the PCRA court denied Sandusky's request based on his failure to satisfy the third prong requirement of showing the evidence is not meant solely to impeach and the fourth prong requirement that the evidence would likely compel a different verdict if a new trial were granted.

Initially, we note that in **Sandusky II** this Court reviewed the PCRA Court's denial of Sandusky's timely filed petition for relief in which he sought

a new trial based on numerous issues, one of which was an after-discovered evidence claim asserting that some of the allegations against him stemmed from false witness memories recovered through repressed memory therapy or suggestive questioning techniques, both of which, Sandusky maintained, altered the memories unbeknownst to the witnesses and thus made their testimonies unreliable. The PCRA court conducted an evidentiary hearing addressing this claim, and victims, A.F's therapist Dr. Gillum, and Sandusky's expert Dr. Loftus testified.

The PCRA court found Dr. Gillum "plainly and credibly" stated he did not treat patients with repressed memory, had a negative opinion of repressed memory therapy and did not engage in it. Likewise, victim D.S. acknowledged that he and his therapists discussed methods of recovering repressed memories but he stated definitively that he did not undergo repressed memory therapy prior to Sandusky's trial. *Sandusky II*, 203 A.3d at 1059 (quoting PCRA Ct. Op., 10/18/17, at 38-39))

Sandusky's expert, Dr. Loftus, opined that her "impressions" gleaned from Dr. Gillum's book, statements D.S. made two years after trial, and excerpted trial testimonies led her to believe the victims had received repressed memory therapy. The PCRA court accorded Dr. Loftus' opinion little weight, however, deeming it to have been "rendered after an uncritical review of an absurdly incomplete record carefully dissected to include only pieces of information tending to support [Appellant's] repressed memory theory,

- 10 -

however, that opinion was entirely ineffective to rebut Gillum's and [D.S.'s] definitive denials." *Id*.

On appeal, Sandusky argued that despite the PCRA court's findings, his after-discovered evidence suggested that A.F., D.S., and Matt Sandusky underwent repressed memory therapy and that if such evidence had been revealed at trial, he either could have presented expert testimony on repressed memory and false or altered memories or could have filed a motion to preclude testimonies based on memories recovered through the technique.

Furthermore, Sandusky insisted that because the focus of his proffer was the reliability—and not the credibility—of the victims' testimonies, "the after-discovered evidence herein is not mere impeachment evidence, as there is a distinction between credibility and reliability." *Id.* (quoting from Brief of Appellant). On this latter point, our Court noted the Commonwealth's characterization that Sandusky was "attempting to circumvent [the third prong of the after-discovered evidence test, *i.e.*, evidence may not be used solely to impeach credibility] by pointing out that those who undergo repressed memory therapy are not lying but 'are simply relating false memories.'" Regardless of the distinction, the Commonwealth continued, Sandusky's claim fails because "there is no evidence that the witnesses underwent repressed memory therapy prior to trial." *Id.* at 1060 (quoting Commonwealth's Brief at 89).

We set forth the governing authority on the issue, as follows:

> To establish eligibility on the basis of after-discovered evidence, a petitioner must prove that (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict if a new trial were granted. *See Commonwealth v. Cox*, 636 Pa. 603, 146 A.3d 221, 227 (2016). In determining whether the evidence would compel a different verdict, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa. Super. 2010) (citation omitted).

*Sandusky II,* 203 A.3d at 1060. [3]

Applying this standard, we found the record supported the PCRA court's

determination that the victims at issue did not undergo repressed memory

---

[3] In *Sandusky III*, this Court noted that Pennsylvania Rule of Criminal Procedure 720 governs Appellant's requests for relief. In pertinent part, it provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(C). The commentary to this rule provides further guidance with respect to such claims:

> [P]aragraph (c) requires that any claim of after-discovered evidence must be raised promptly after its discovery. Accordingly, after-discovered evidence discovered during the post-sentence stage must be raised promptly with the trial judge at the post-sentence stage; after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge; *and after-discovered evidence discovered after completion of the direct appeal process should be raised in the context of the PCRA*.

Pa.R.Crim.P. 720 at cmt. (emphasis added). *See also* 42 Pa.C.S.A. § 9543(b)(2)(vi) (recognizing an after-discovered evidence claim as an issue cognizable under the PCRA). Thus, a defendant's duty to promptly file a Rule 720(C) motion is directly related to the time of discovery.

therapy prior to trial, as the PCRA court deemed Dr. Gillum credible when he "unequivocally denied" using the therapy while deeming Dr. Loftus' opinion fatally based on incomplete versions of the record. Therefore, this Court concluded that by Sandusky's own argument he could not establish the after-discovered evidence would be used for a purpose other than impeachment, nor could he establish that such after-discovered evidence would compel a different verdict. *Id*.

In ***Sandusky III***, Sandusky raised another Rule 720(c) claim in which he sought to present different after-discovered evidence pertaining to notes and emails written by members of the Louis Freeh investigative team,[4] but we declined to address the merits of this claim after concluding Sandusky failed to comply with the procedural requirement of Rule 720(c) that he file a "prompt" post-trial motion for a new trial when he learned of such evidence during the post-sentence phase but waited six months to file a Rule 720(c) motion. ***Id.*** at *7.

In the case *sub judice*, Sandusky raises a new after-discovered evidence claim in a timely-filed PCRA petition in which he again asserts that victim testimony used against him at trial was tainted through the improper use of repressed memory therapy and suggestive interviewing techniques. In this regard, he offers new evidence in the form of a recorded 2018 interview

---

[4] The investigative team led by Louis Freeh, Esq., was appointed by the Penn State Board of Trustees to conduct an independent inquiry into events surrounding Sandusky's crimes.

- 13 -

between civil attorney Andrew Shubin and his client, victim S.S., and a 2021 podcast in which "Second Mile" graduate and supporter of Sandusky, A.J. Dillen, played audio recordings he surreptitiously obtained while falsely posing as a Sandusky victim in over 100 therapy sessions with Attorney Shubin's chosen therapist, Cynthia MacNab. Sandusky argues this new after-discovered evidence calls into question the court's prior factual findings that neither suggestive interviewing techniques nor repressed memory therapy played a role in altering and enhancing purported memories and allegations of abuse.

Specifically, Sandusky claims he presented to the PCRA court "compelling evidence that Attorney Shubin and therapist MacNab tainted the memories and claims of their clients via suggestive and improper interviewing and therapy techniques." Reply Brief of Appellant, at 4. This new evidence, he insists, "shows that Attorney Shubin helped to alter his clients' claims of sexual abuse and that the therapist he sent his clients to, Cynthia MacNab, was actively engaged in a type of discredited therapy with Shubin's clients, including multiple individuals who testified at Sandusky's trial, that can result in false memories." Brief of Appellant, at 30.

From this introduction, Sandusky refers to excerpts from the 2018 interview between Shubin and S.S., who did not testify at Sandusky's trial because, Sandusky infers from the record, he had denied sexual abuse during statements given to law enforcement investigators. Sandusky highlights where Shubin first asks S.S., generally, if Sandusky ever touched him, which

draws denials from S.S. such as, "Not that I ever recall, no", and "I don't remember doing nothing", before asking more specifically if Sandusky tried to have anal sex with him in the showers, to which S.S. replied, "No."  When Shubin asks, "Okay, so you don't remember that happening at all or just not in the showers?", S.S. responds, "In the showers, or, I don't think ever. . . I don't think at least.  I don't recall that."  "Motion for New Trial on the Ground of After-Discovered Evidence and Request for Evidentiary Hearing", 6/16/2022, Exhibit A, "Interview with [S.S.], PART I", p. 11.

While S.S. eventually identifies and describes episodes of abuse, Sandusky underscores that such accusations occurred only after the many opportunities S.S. had to tell criminal investigators but failed to do so. Sandusky further highlights another response given by S.S. when he said, "I just said, 'no, nothing happened,' and [I] *just buried it even more*[,]" to the extent it may be viewed as parroting a term of art suggested by Shubin.  Brief of Appellant at 32 (emphasis in original).

The Commonwealth disputes the claimed importance and probative value of such evidence and observes the S.S. interview differently than does Sandusky.  It begins by noting that S.S. was not alone with Attorney Shubin during the first segment of the interview but was accompanied by his mental health treatment provider, Jill Curley.  Brief of Commonwealth, at 20.  The Commonwealth notes that in the same interview S.S. specifically related being sexually assaulted by Sandusky in a pool, a dormitory room, in the shower, and at Sandusky's home.  *Id.* (citing Motion for New Trial, Exhibit A, *supra*,

at pp. 1, 3, 10, and 13). It was only when S.S. asked Ms. Curley to leave the interview room, but remain nearby—because he was embarrassed to share graphic details in the presence of a female—that Shubin was alone with S.S. *Id.* (citing "Motion for New Trial", Exhibit A, "Interview with Shawn Sinisi, PART II, at p.1). Also noteworthy in the Commonwealth's view, apparently as it signified a moment of earnest, poignant personal reflection in his own words rather than a manifestation of undue influence, was S.S.'s observation that, ". . . up until the edge of now like I don't know who I am anymore, like he . . . like he stole like my childhood from me, like I didn't have a life to grow up to." *Id.* (citing "Motion for New Trial", Exhibit A, PART II, at p. 25).

Sandusky offers the Atty. Shubin/S.S. interview as a template to apply to the assessment of three Sandusky victim/accusers who testified against him at trial—D.S., J.S., and R.R. He observes that, like S.S., these three witnesses originally denied being subjected to sexual abuse before eventually changing their stories and alleging abuse only after retaining Shubin and seeing therapist Cynthia MacNab. Brief of Appellant, at 33.

As for witness A.J. Dillen's self-styled "sting" operation of Shubin and MacNab, Sandusky claims it reveals that Shubin likely enhanced his other clients' stories of abuse by suggesting the occurrence of additional acts, such as groping, in the same way that he enhanced Dillen's story of abuse. Brief of Appellant, at 34. He offered recordings of their sessions to support his position that Shubin was suggesting to clients that only by making certain

accusations would they become eligible to receive large civil suit settlement offers.[5]

Dillen presented a similar opinion on Shubin's colleague, therapist Cynthia MacNab, with whom he met weekly for three years and surreptitiously recorded their sessions. According to Sandusky, the critical aspect of the Dillen/MacNab recordings is that they indicate MacNab espoused an opinion that some Sandusky accusers "dissociated" and had forgotten—or, stated in another way, had repressed—memories of abuse. Sandusky offers the following excerpts of the recordings as creating an issue of material fact regarding whether MacNab engaged in repressed memory therapy:

> **MacNab:** Having sat with these guys [Sandusky accusers], some of them, and having watched them struggle with the aftermath of it and the memories of it, I believe them, the ones I've met with. Because I don't think people can make that kind of stuff up unless they're tremendous actors.

---

[5] One excerpt included Shubin telling Dillen,

> Because victims, and you know this, they come forward and they . . . you know, they say nothing happened, right? It's typical, "Nothing happened to me. Jerry was a father figure to me, right? And then, you know, they later say, they go before a grand jury and they say, "Well, you know, something happened but, you know, it was only this, and I don't remember," you know?
>
> And then when they get to the right people, like psychologists, therapists, you know, the right attorneys and, you know, they understand that they need to get it all out on the table, otherwise – you know, that's their only chance, and then they get the support because they're talking to someone who understands, or they go to a psychologist or a therapist, and then they remember a whole lot more, right?

. . .

I think that it's hard for people to fake the kind of emotions that I have seen in some of them.  And I think, yeah, you're right, it's subjective, but I have a pretty good bullshit detector, I think, so I rely on it.

. . .

**MacNab:**    We're talking about why you repressed or hid it or whatever (inaudible).

**Dillen:**    Right.

**MacNab:**    I think that people do repress memories, and I think that people don't really – I mean, I think there's a whole continuum of what that means.  Sometimes it means they totally forget and it's not in their consciousness at all until something happens some time in their life, like they have a child and the child reaches the age that they were when they were abused, and then suddenly this stuff comes flooding back, and it's like, "What the hell?"  So, that's at this end of the continuum.  At this end of the continuum, the other side is knowing but not wanting to think about it and sort of putting it out of your mind, the way you deal with anything that's unpleasant, but knowing it's there but just not focusing on it.  And then there's everything in between.  So, this over here on this end, where they didn't remember, that's repressed memory, and this isn't, but I prefer to use the term "dissociation."  Dissociation just means, disconnect, and there's different ways that we can disconnect, and we all do it to a greater or lesser degree, you know?
. . .

But yes, people can disconnect for years, and they can disconnect from – what's the acronym?  I'm not going to be able to remember.  They can disconnect from the knowledge of what happened, they can disconnect from the feelings of what happened, they can disconnect from the body sensations of what happened and – there's one more, I can't remember it. (Inaudible) So, -- or all of those.  And, you know, you talk about – a dissociation happens when you're in a situation that is beyond what's normal, what people normally encounter, and combat is a good example, and I think that's where we first started learning about PTSD, was with combat veterans.

- 18 -

. . .

A person can be abused, forget about it, and then something happens that—some little thing, like the way the light comes in through a window or something can trigger the memory years and years later, and suddenly they have a memory of being abused, and it's very confusing and can kind of startle you (audible) like, ["]What the hell is happening?['']

. . .

So, we've talked about dissociation, and I guess I'll go again to that to try to explain this to you.  The mind has a lot of stuff built into it that helps protect it, and one of the things is dissociation. . . .  So, the mind does what it does.  It sort of forgets pieces, forgets pieces or chunks them up so that you don't have to try to take in the whole overwhelming thing.  Does that make any sense?

. . .

I've talked to quite few guys who were abused by Jerry Sandusky, and this is the case pretty much for all of them, they forget.  Not really, because it's kind of back there, kind of back there[.]

. . .

Some of them remembered on their own, like you did eventually, in more adulthood.  I talked to a guy yesterday who's in his 20s and he didn't remember until the last six months, I would say, and he was, like, eight or nine when it happened.

. . .

Some didn't remember, some did, but they put it out of their minds, 'I'm not going to think about that,' didn't tell anybody.  Nobody told anybody.

"John Ziegler Production, 'With the Benefit of Hindsight'", 4/10/2021, pp.

112, 116, 122-23, 123, 125, 159, 160, 183, 186.

Herein, Sandusky contends the trial court erred when it dismissed his after-discovered evidence claim without first conducting an evidentiary hearing on his proffer alleging that Attorney Shubin and therapist MacNab used improperly suggestive interviewing techniques and controversial repressed memory therapy, respectively, to manipulate those Second Mile participants who initially denied sexual abuse into changing their stories to claim sexual abuse victimization.

Regarding when a PCRA court should conduct an evidentiary hearing on a Rule 720 motion, pertinent decisional law has recognized:

> "A post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(C). The comment to the Rule states, unlike ineffectiveness claims, evidence discovered during the post-sentence stage must be raised with the trial court, evidence discovered while the case is on direct appeal must be raised then, along with a request for remand to the trial court, and evidence discovered after direct appeal should be raised in the context of the PCRA. *See id.,* 720 cmt.

*Castro*, 93 A.3d 818, 825 n.4 (Pa. 2014).

As Sandusky's after-discovered evidence claim is raised after the expiration of time for a direct appeal, we review his claim within the context of, and according to standards applicable to, the PCRA. Our standard of review of an order denying PCRA relief is well-established:

> Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. With respect to the PCRA court's decision to deny a request for an

evidentiary hearing or to hold a limited evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

*Commonwealth v. Murchison*, 294 A.3d 1251, 1260-61 (Pa. Super. 2023) (*en banc*) (quoting *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015) (citations and quotation marks omitted)).

Applying the standards of the PCRA to Sandusky's present motion for an evidentiary hearing pursuant to Rule 720(C), we observe:

The PCRA court may dismiss a petition without conducting an evidentiary hearing when the court is satisfied that there are no genuine issues concerning any material fact, the defendant is not entitled to postconviction collateral relief, and no legitimate purpose would be served by any further proceedings. *See* Pa.R.Crim.P. 909(B)(2); *see also Commonwealth v. Johnson*, 139 A.3d 1257, 1273 (Pa. 2016).

Further, an evidentiary hearing is intended for the presentation of evidence, and not the potential discovery of evidence. *See Commonwealth v. Castro*, 93 A.3d [at] 828 []. Such a hearing is not meant to function as a fishing expedition for any possible evidence that may support a petitioner's speculative claims or allegations. *Id*.

*Commonwealth v. Soto*, No. 831 EDA 2023, 2024 WL 2153513, at *4 (Pa. Super. Ct. May 14, 2024) (non-precedential decision cited for persuasive value)[6].

---

[6] This Court may cite its non-precedential memoranda filed after May 1, 2019, for persuasive value. *See* Pa.R.A.P. 126(b).

- 21 -

Within the context of Rule 720(c), it is the movant's burden to produce evidence sufficient to satisfy each of the four prongs of the rule, as discussed *supra*. **See Castro**, 93 A.3d at 821 n. 7 (citing **Commonwealth v. Pagan**, 950 A.2d 270, 292 (Pa. 2008)). After careful review of the record, party briefs, and the PCRA court's opinion, we conclude that Sandusky fails to satisfy the requirements of both the third and fourth prong of Rule 720(c), such that the PCRA court properly denied him an evidentiary hearing.

Initially, we consider the offer of Mr. Dillen's recordings of Attorney Shubin, who stated victims must procure the right attorneys and come to understand they have only one chance to reveal their story. Despite Sandusky's protestations otherwise, such commentary could implicate only the credibility of the witnesses represented by Attorney Shubin, for if there is any undue suggestion implicit or explicit in his recorded words at issue, it is that monetary damages in a civil suit against Sandusky would require a plaintiff to make certain accusations. Indeed, it strains credulity to suggest that these words attributed to him, alone, could have altered witnesses' memories or confused them into falsely believing they were sexual abuse victims when they previously believed they were not and offered denials to that effect. Therefore, we discern no error with the PCRA court's refusal to grant an evidentiary hearing based on this evidence, which, because it could serve no defense purpose other than to impeach the testimony of the witnesses counseled by Attorney Shubin, fails to satisfy the requirements of the third prong of Rule 720(c). **See Sandusky II**, 203 A.3d at 1060 (holding

Sandusky's failure to establish use of repressed memory, or memory altering, therapy or technique required the conclusion that evidence could not be used for a purpose other than impeachment).

Similarly, we perceive no error with the denial of an evidentiary hearing after review of the secretly recorded statements of therapist Cynthia MacNab during her sessions with Mr. Dillen, reproduced *supra*. Nowhere in Dillen's account does MacNab suggest she employed repressed memory therapy with any of the Sandusky witnesses at issue, and we find it particularly noteworthy that despite Mr. Dillen's completion of a three-year "sting" operation in which he gained MacNab's confidence and received therapy through deception, at no time does Dillen claim MacNab recommended or implemented repressed memory therapy in his case. In fact, as the Commonwealth points out, the recordings revealed that MacNab categorically denied engaging in any suggestive techniques, including repressed memory therapy, stating to Dillen, "I did not suggest things to you. I never suggested any memories to you." N.T., 4/10/2021, at 211.

The PCRA court determined that both Dillen's recordings and the Sandusky-sympathetic podcast commentary based thereon were the product of a biased producer advocating on Sandusky's behalf rather than attempting to discover new facts bearing on the truth-determining process that took place at trial. Given the PCRA court's findings, which we determine are supported by the record and reached after due consideration of the integrity of the proffered after-discovered evidence, the motives of those offering it, and the

overall strength of the evidence supporting the conviction, we conclude Sandusky made no presentation sufficient to warrant an evidentiary hearing, let alone be awarded a new trial, pursuant to the Rule 702(c). Because he failed to present any evidence of undue influence of repressed memory therapy on witnesses, he could meet neither the Rule 702(c) third prong requirement, as discussed *supra*, nor the fourth prong requirement that such evidence would likely compel a different verdict if he were awarded a new trial. **See Sandusky II**, 203 A.3d at 1060 (concluding Rule 702(c) fourth prong not met where credible evidence undermined the after-discovered evidence claims).

Finally, on the contested interview of Attorney Shubin and S.S., recounted *supra*, Sandusky points to no more than the fact that S.S., like other Second Mile accusers of Sandusky, denied sexual abuse before being represented by Attorney Shubin and receiving therapy from MacNab, and then alleged sexual abuse after receiving therapy. This fact alone is not indicative of undue influence or suggestion, nor does it imply the use of a discredited repressed memory therapy by Shubin, MacNab, or anyone else. To award an evidentiary hearing on nothing more than the occurrence of a common result of appropriate psychological therapy, *i.e.*, a patient's eventual acknowledgment of a difficult traumatic event, would unacceptably lower the standard for obtaining a hearing to simply having requested one. The information and evidence presented in this matter do not raise an issue of material fact. The only facts alleged are that multiple child victims were

averse to making the difficult revelation of sexual abuse at first but came forward later. On this record, we find no error with the PCRA court's order denying relief without a hearing on Sandusky's after-discovered evidence. [7]

In Sandusky's remaining issues, he offers a two-part challenge to the trial court's order imposing costs after this Court vacated the original restitution portion of his criminal sentence in the amount of $95,047.88 for want of a causal connection between the restitution and his underlying crimes. First, he argues the trial court exceeded its authority conferred by this Court in our "limited remand" order directing it to address the original restitution amount when it permitted the Commonwealth to introduce evidence showing that much of the amount was properly categorized as costs, rather than restitution, and then enter an order imposing such costs. The Commonwealth maintains that the trial court followed this Court's order calling for it to ascertain the origin and basis of the $95,047.88 restitution and address any outstanding issues relating to it.

Following remand, a trial court has jurisdiction only to address the issues upon which the appellate court has based its remand. ***Commonwealth v.***

_____

[7] Because the Attorney Shubin/S.S. interview and the Dillen recordings—whether considered individually or in conjunction—supplied no indication of memory altering techniques or therapies used on clients or patients, we conclude that Sandusky failed to lay the factual or evidentiary basis necessary to introduce the expert testimony on repressed memory/false memory therapy or other memory-altering interview techniques that Dr. Barden was enlisted to provide. ***See Sandusky II***, 201 A.3d at 1063 (holding expert testimony on the subject of repressed memory would be irrelevant without underlying evidence that victims underwent repressed memory therapy before trial).

*Sepulveda*, 144 A.3d 1270, 1280 n.19 (Pa. 2016). In ***Sandusky III***, this Court vacated the restitution component of Sandusky's criminal sentence and remanded for further consideration of any outstanding issues related to the $95,047.88 in question. We directed:

> Therefore, we vacate that portion of [Sandusky's] criminal sentence at case number 2422-2011 requiring him to pay $ 95,047.88 in restitution. Furthermore, limited remanded is appropriate due to conflicting representations in the record as to the origins of the $95,047.88 in restitution. Upon remand, the sentencing court shall address any outstanding issues related to the $95,047.88 in restitution discussed above and ensure that [Sandusky] is resentenced in conformity with [18 Pa.C.S.] § 1106(a).

***Sandusky III***, ***supra*** at **5-6.

In assigning the trial court the task of determining the "origins" of, and "address[ing] any outstanding issues related to," the $95,047.88 placed into question, this Court's remand directive authorized the trial court to properly reapportion the amount into restitution and court costs, respectively, and impose court costs as part of that process. Thus, the trial court did not impose new costs not already contemplated in the original restitution sentence. Accordingly, we reject Sandusky's argument that the trial court exceeded the scope of our remand directive.

In the second part to Sandusky's challenge to the court's order imposing costs, he asserts that the trial court erroneously calculated court costs at $44,688.58 when, he says, $22,766.96 of those costs was not supported by any testimony or verified statements and where the individuals responsible

for creating the records did not testify. The Commonwealth identified the referenced $22,766.96 as the cost of reimbursing the Bellefonte Borough Police Department, and it contends that it satisfied its burden of proof and production through the testimony of Bellefonte Borough Police Chief Shawn Weaver, who was the designated "Incident Commander" responsible for organizing an operational group of police officers from neighboring communities to provide security and other measures during the 2012 Sandusky criminal trial. N.T. at 5/25/2023, at 4-5.

At the hearing on costs, Chief Weaver explained that "through months and months of preparation meetings with neighboring departments, neighboring chiefs, with all the stakeholders in the community to include the school district, the -- PennDOT, emergency management, EMA" and others, they assumed responsibility for critical public safety and logistical matters. N.T. at 5. During the preliminary hearing and the nine-day trial, law enforcement effectuated measures such as temporarily closing roads including the state highway running in front of the courthouse, escorting school children walking to and from two elementary schools located near the courthouse to ensure their safe passage amidst the large influx of media, increased vehicular traffic, and pedestrian traffic, rerouting vehicular traffic—which Chief Weaver indicated required "quite a bit of manpower every day to make sure the vehicular traffic wasn't . . . interfering with the media[,]" and providing security details throughout the trial. N.T. at 5-8.

As to the security detail, Chief Weaver testified that they provided "extra measures" to ensure the safety of not only the trial judge but also everyone else involved with the trial. N.T. at 8. He elaborated,

We – not just for the Judge, but for the whole event, we had a tactical response team which was manned with 3 or 4 special officers with special equipment every day. We had 5 to 6 additional officers from other jurisdictions assigned to us for the 9-day trial from Penn State, State College, Ferguson Township, Patton Township. And also, that does not include the normal compliment of officers that I had out during the day, to include myself, who were assigned to the 9-day trial as well.

. . .

[With respect to "extra" security measures for the judge, witnesses, attorneys], PSP had a helicopter, the state police had a helicopter. We had another trial going on at the same time, so we also had details to make sure that the judge[s] arrived safely for both trials. We had a detail to make sure that the jurors got in safe, the witnesses for both trials. So, it was a very hectic morning every day, the mornings were very hectic making sure everyone arrived safely.

. . .

[While trial was in session,] a lot of foot patrols were being done. The tactical team were in their places. We also had a plain clothes detail that would, you know, operate in the peripheral, if you will. [Chief Weaver adds that all of the extra measures were taken also to ensure the safety of Mr. Sandusky.]

. . .

[With respect to ensuring Mr. Sandusky's safety during the preliminary hearing, Chief Weaver explained that] [f]irst of all, we were briefed daily. Probably like, I would say if I can recall, 2 to 3 weeks prior to the December hearing, preliminary hearing, we were briefed I would say every other day by PSP intel, intelligence, on threats, possible threats Mr. Sandusky had against – or, you

know, remained against him. They were scouring the internet, you know, blogs, whatnot. So, we were briefed quite a bit on that.

Other steps were we basically had a contingent of 60 sworn officers, state, local, federal, and the sheriff's department. Everything was geared towards the safety of everybody, to include Mr. Sandusky. We had – for his trip here, we had following vehicles, police vehicles as well as an aircraft and a live feed to command post. We had a command post set up at the Logan Fire Hall, which is about a block east of us – or north of us. We had numerous foot patrols of state and local officers. . . . We brought bomb barriers, a barricade – they're barricades to prevent any vehicles coming in, we got them from the University. They basically, if you hit a button if someone tries to go through them, you know, spikes come up through.

We did a preliminary search of the courthouse with a bomb dog prior to the hearing. Quite a bit went into it. A lot of preparation, a lot of – everywhere from having the rope to put barricades out to having a medical plan in case there was an emergency, in case of anyone trying to harm Mr. Sandusky. [Chief Weaver goes on to confirm that for the 9-day trial they "basically mirrored" the preliminary hearing security details just described.] N.T. at 13.

. . .

[After each day of trial], [t]here was a transport team that I'm pretty sure the sheriff's department provided the vehicle and the contingent of probation also helped, probation and parole, they traveled with Mr. Sandusky I do presume. But we had following our staff in the police vehicles and I do believe several – on several occasions the state police helicopter was available to help facilitate that.

. . .

[Chief Weaver agrees that Sandusky's trial "obviously involved overtime for his department" and "the involvement of other municipalities that [he] mentioned."]

N.T. 9–15.

The Commonwealth handed Chief Weaver a copy of the document he prepared and submitted to "either the Attorney General's Office or the Court Administrator's Office of Centre County" reflecting the overtime hours that Bellefonte Borough, Spring Township, Ferguson Township, State College, and Patton Township rendered in connection with the Sandusky trial. N.T. at 16-17. The total overtime cost submitted was $22,766.96. Chief Weaver testified that the document he prepared was based on the individual invoices provided by each municipality at the time, but he explained that all the invoices were "purged" from their respective files after the passing of 8 years, which was two years longer than required under statute. N.T. at 17.

Chief Weaver added that the $22,766.96 did not include other hours of non-sworn officers and "straight time" during which the officer was on duty. N.T. at 18. He elaborated, "This is way lower that what the actual – you're talking about meetings, prep time, drawing up the incident operation plan. This is probably, I would estimate, 25 percent of [the cost]. That's not including administrative time. There's a lot of hidden costs associated with this." N.T. at 18.

The trial court indicated that "in terms of recordkeeping, the explanation, the court is satisfied with the explanation." N.T. at 20. Oral argument on total costs ensued, and the Commonwealth explained that it arrived at the $44,688.57 figure by subtracting from the initial figure of $95,047.88 the salaries that had been reimbursed by the state, and the $7,942.04 costs of incarceration. N.T. at 21.

Herein, Sandusky's challenge to the final amount of costs centers on his contention that, "The Commonwealth presented an invoice through the Centre County Deputy Court Administrator that referenced reimbursement to the county for outside law enforcement in the amount of $22,766.96. The Commonwealth did not present any testimony or evidence on how that figure was arrived at, and it produced no supporting documentation for that figure." Brief of Appellant, at 61.

The Commonwealth counters that the reimbursement was justified through the detailed testimony of Chief Weaver regarding both the additional services and overtime incurred by numerous law enforcement officers from neighboring police departments. Furthermore, the trial court deemed credible his testimony that the $22,766.96 figure he recorded on the document submitted to Centre County at the conclusion of the trial was the sum of all invoices submitted to him by the participating law enforcement departments.

The Commonwealth has the burden of proof to show that the costs of prosecution incurred were necessary to the prosecution of the defendant. **Commonwealth v. Garzone**, 993 A.2d 306 (Pa. Super. 2010) (acknowledging costs may be allocated to convicted defendants under 16 P.S. § 1403 where costs were necessary to bring defendant to conviction). Here, Sandusky directs us to no authority precluding a trial court from weighing the evidence presented on the issue of prosecution costs and deciding the matter on a credibility determination supported by official documentation, nor do we

find error with the trial court's credibility assessment under the relevant record.

Specifically, the trial court acted well within its discretion when it determined that Chief Weaver supplied credible testimony about not only the uncommon additional services and overtime required of numerous law enforcement personnel to maintain the safety of both the public at large and court personnel, witnesses, lawyers, jurors and parties involved in this high-profile, emotionally charged criminal trial, but also his preparation of post-trial documentation he submitted to the county seeking reimbursement of the $22,766.96 in total expenses incurred by the participating police departments in the aggregate. This figure, he testified under oath, was supported by post-trial invoices signed and submitted by each police department in the ordinary course of business. Although the underlying invoices had been purged long after the departments had been reimbursed and in a manner consistent with governing law, the trial court reasonably credited Chief Weaver's testimony that all payments had been substantiated with appropriate post-trial documentation. Accordingly, we reject Sandusky's challenge to the imposition of costs.

Order affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 09/19/2024